Good morning, Your Honors, and my name is Peter Hoshary, and I'll be presenting the argument on behalf of the petitioner. Would you keep your voice up, please? I'll be presenting the argument on behalf of the petitioner. It is the petitioner's position that the record does not support negative credibility finding in this case. It is well-settled law that the immigration judge must offer a specific cogent reason for any stated disbelief. But why aren't the employment workbook and the signed invoices substantial evidence that your client continued to work after the March 10th meeting? Thank you, Your Honor. That was the next issue on my outline.  Mr. Harutyunyan explained that he did not make the entry in that book. He did not obtain that document and bring it with him to the United States. His mother-in-law was the one who obtained that document from the Ministry Department and brought it over to the United States, or sent it over to the United States for submission as evidence. This evidence, it's in DEMIA's job versus INS, discrepancies cannot be viewed as attempts by the applicant to enhance his claim. If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility. He submitted this evidence. This evidence seems not only not to enhance his claim of persecution, but it could be damaging to his claim of persecution. He submitted that evidence, and he provided explanations for that evidence, for the discrepancies in that workbook. Namely, he said that he offered his opinion that the government would not want to put the reason why he left his position, and they would want to make it look like he just left work. So he was a political dissident, and according to his testimony, he stopped working in March, and the book reflects that he was fired in May. Why would the agency not want to say the reason he was fired, or not fire him earlier when he wasn't going to work? Well, I think the reason goes to his claim for persecution. He's claiming that he was offering his political opinion as to the government's involvement in the massacre or the shootings that occurred in the parliament, and that he knew who was involved, and he knew who had done that. And I think the government was just trying to cover that up. The corruption runs very deep in this country, as evidenced by the country reports, and I think the government made it look like he worked all the way up until his departure from the United States, I mean, from Armenia to the United States. In other words, he was saying that it was not true, that he continued to work after the beating? He did not continue to work after March, I believe he testified after the March 10th incident. Yes. So was there any, this is a pre-Real ID Act case, right? Correct. So did he authenticate the workbook? I'm unsure of that, Your Honor, but he did submit it as evidence. It was not submitted by the government. Okay. And did he explain who made the entries in the workbook? He didn't make the entries? He didn't make the entries in the workbook, yes. And what was the second omission? The second omission was, maybe you could explain to us, that he didn't mention in his original asylum application his support for the opposition political party. That was the second omission that the BIA relied upon. You mean the discrepancy between the original statement that he provided and the second statement that he provided? The original asylum application. There were additional details in the second asylum application. Right. And he did explain that he did not have legal assistance when he was preparing the first asylum application, and he merely told his story to a friend, and a friend recited it on a piece of paper. He did describe the events, the two events where he was beaten. He did not add any additional events of actual physical harm. He just basically added additional motivating factors that led to the beatings. They were not inconsistent with one to the other. When he had legal counsel, legal counsel explained to him that he needed everything that he could possibly get as far as anything that could be a motivating factor for those beatings, and apparently the story was told and the supplement was filed. And if respondents are not allowed to add supplemental evidence to their file, then it's their burden to prove their persecution. So it would stop any submission of any further evidence. So, in essence, his argument or his explanation was that some people were trying to set him up as being responsible for the massacre because he was in charge of the weapons within the agency? I believe that's one of the reasons. There was also, because he was speaking out, they wanted to quiet him down or shut him up, and so he wouldn't continue his opinions about the government and how corrupt they are and their involvement in the parliamentary shootings. And what's our standard of review in this case? What? If we were to reverse, on what basis? What's the standard of review? That it would be, there would be no, the judge did not offer plausible and cogent reasons for his or her stated belief and that the record would compel that any reasonable person reading the record would have to find an adverse, would have to reverse the case based. We'd have to be compelled to find that there was no substantial evidence. Correct, correct. Do you think that standard is met? I think that standard is met. I think there were explanations for all the discrepancies found by the immigration judge. Was the immigration judge required to accept those explanations? The immigration judge was not required to accept those explanations, but the immigration judge was required to offer a plausible explanation as to why she did not believe the petitioner in this case. Specific cogent reasons, right? Correct. And she failed to do that? Correct. And I'd like to use my remaining time for, well. All right. Thank you, counsel. May it please the Court? My name is Jessica Malloy and I represent the U.S. Attorney General in this matter. Your Honors, petitioner's claim has fluctuated too many times in order to provide the requisite ring of truth in order for the agency to grant his applications for relief and protection. Beginning first with the inconsistency regarding whether or not he returned to work, as was pointed out, the documents that he did submit, and they were authenticated, Your Honor, on page 165 in the record. He did authenticate those documents. Those documents directly conflict with his testimony regarding whether or not he. Why would he submit them then? The documents were submitted before the inconsistency was, I guess, discovered, apparently, from the record. On page 165 is when. He was represented by counsel at that point, right? Yes, Your Honor. So the counsel was certainly aware of the earlier application and that discrepancy and also was aware by then what his factual statement was as to when he was fired. So why would he submit those if he thought they were going to discredit the testimony? It's unclear, Your Honor, at what point the inconsistency was discovered by petitioner's counsel. In the first instance, on page 165, the workbook was offered into evidence as proof that he did indeed work for the Internal Affairs Ministry, and that was the end of the discussion. It wasn't until Cross, when DHS raised the issue that, well, and the immigration judge actually raised the issue, that the workbook says that he continued working through March 29. So now we're pre-real ID, right? How does that go to the heart of his asylum claim? It goes to the heart of the claim on whether or not the persecution occurred. He's arguing that he suffered harm on March 10th, but if he suffered harm on March 10th and he left, he refused to go back to work for his alleged persecutors, the Armenian government, then that would make sense. But if the documentary evidence shows that he returned to work for his persecutors for three months after this alleged incident of harm, then it goes to the heart of the claim on whether the incident occurred, whether he really feared the individuals that allegedly persecuted him. Or whether he left at all. Yes, Your Honor. So where were the specific cogent reasons that the IJ used to disregard his explanation for that? Well, the IJ asked, he was actually provided three opportunities to explain this inconsistency. First, the immigration judge on page 193 of the record asked, you did not go back to work after March 10th? And he said, no, I did not. And then later, the immigration judge more specifically said, but the workbook says March 10th. Why is that date of service, oh, sorry, but the workbook says that service ended May 29th. Why would the workbook say that? And he says, I don't know. Probably that was an inside decision. And then finally, DHS, when it came to the invoice of ammunition records, asked him to verify his signature, asked him to verify the date of April 6, 2000 as being the date that ammunition was received by the petitioner in this case, and asked, what does this document mean? And he said, if I was there, then if it was coming from outside, then I had to receive that. And DHS said, and you had to sign the receipt. He says, yes. So they could keep track of arms that come in and out, right? Yes. DHS is the one that provides his explanation for the inconsistency. And is it your claim that you pre-signed these forms? Yes. That's it. There's no further explanation. And as the agency explains, that doesn't he doesn't explain why he would pre-sign the forms, let alone put pre-signed forms in a safe that, as he claims, other individuals could access after he allegedly leaves. He certainly doesn't attempt to explain why those forms are predated or why he would have that in the record. And as far as the employment record, the workbook, the agency did not understand why it would benefit the Armenian government to lie about what date that he left. And there isn't really a sufficient explanation. He argues that because he submitted the evidence, it shouldn't be used against him. But it's not clear from the record that he submitted this evidence honestly knowing that this inconsistency existed. And he certainly doesn't explain why the invoice coupled with the workbook would prove otherwise, would compel the court to conclude contrary to the agency's decision that this does establish he was inconsistent. Do you agree with the alternative holding of, like, assume that he is credible? Do you agree with the alternative holding that the beatings and detention did not rise to the level of past persecution? Your Honor, the agency's holding that it did not rise to the level of persecution was supported by substantial evidence. The record's clear starting on page 208. He describes that these incidents of harm, these two incidents of harm, did not result in any bleeding or any injuries that required him to seek medical attention. And this court in Gu and Prasad, Hoaxa, have discussed similar incidents where petitioners were forced into very unfortunate incidents where petitioners were forced and beaten and interrogated and detained even at gunpoint, but did not likewise seek medical attention. And in those cases, there wasn't a finding of past persecution. So the agency compared these two incidents of harm, assuming credibility, and determined that it was comparable to those instances because he did not seek medical attention. But, Your Honor, if the court does determine that there is no basis for the adverse credibility determination, it would have to remand even with this alternative finding because the agency would still need to consider whether or not there is a well-founded fear of persecution and likewise for torture. What is the status of the spouse's asylum application? Is it dependent on his? Yes, Your Honor. She is a derivative beneficiary, but it's based on his claim. He's the applicant. Was the cat claim waived in this case? Your Honor, ordinarily when the petitioner does not raise an issue and is briefed to the board, then it is unexhausted. However, when the board considers the claim in a sua sponte fashion, as it did here on the third page of the decision, then the issue is exhausted. This court considers the issue exhausted. So where in the BIA claim, in the BIA decision, did you say the cat claim was discussed? On the third page of the board's decision, right at the top. The second to last sentence of the first paragraph, the IJ also determined that because of the respondent's lack of credible testimony, he failed to establish a claim under the cat. We declined to disturb those findings, and the board did adopt and affirm explicitly and also cite matter of Urbano regarding the IJ's decision, which did analyze his cat claim, and so it would be our position that that did sua sponte consider the cat claim. I think we were going to say the same thing. Is that sufficient to resolve the cat claim, though, just a reference to the adverse credibility determination? Under the court's decision in FERA, when the claim for protection under the Convention Against Torture is the same as the claim for asylum and withholding of removal, and an adverse credibility determination has negated that claim, then the individual is still not credible regarding his claim for protection under a cat claim. Well, but then you have to look at the country conditions report. You can't just stop there. You still have to see if there's any other evidence in the record that would support the cat claim. Was that done here? Well, the board did have a caveat saying that there was in that same page on the footnote, saying that there was no exhaustion regarding any alternative findings in the record that would support a claim for protection under cat. And so to the extent the board did address it, it addressed it in a very limited manner, and that's what limits the court's review of this case because that issue was not raised below. If the board is going to consider the claim, doesn't it have to look at the country condition reports to see if it's more likely than not that he would be tortured? Well, the board is not required to consider anything that was not raised to it below. But why did it discuss it then? Once the board takes it upon itself to sua sponte discuss it, then it has to meet the legal requirements to resolve the issue. Well, it certainly addressed the cat claim, but it said it declined to disturb the decision below. What were the findings in the IJ's decision that would meet the requirements for discussing the cat claim? The immigration judge also denied the application for cat protection based on the credibility determination. And nothing else? I do not believe so, Your Honor, but I can double check. I do not believe so. Which year country reports are in this record? Oh, I believe it's the 2000. Yeah, on the record, page 8060, IJ says, likewise, because I do not find the respondent to be a credible witness, I find that he has not carried the higher burden of showing under convention against torture that it's more likely than not that he would be tortured. It was based on the adverse credibility determination. And the petitioner did not allege, which is why it's not before the court today, that the actual record evidence was sufficient to determine. And I apologize, I just realized I am past time. I'm just wondering if the cat claim was discussed in the blue brief. I can't remember. I'll have to double check that. In petitioner's brief to the court, he did address the cat claim. But, again, we would argue that to the extent he's addressing evidence in the record, that information was not raised to the board, and so the board was not. I don't know if you can parse it like that. I mean, it's such a fine parsing that you're attempting to do. But I don't know if you can do that for the cat claim. Anyway, thank you. Do we have any more questions? Okay, thank you. Thank you. Thanks. I'd like to use this time to discuss the issue of the beatings rising to the level of persecution. The February 24th incident, February 24th, he was beaten so severely that he lost consciousness. The March 10th incident, he was beaten, threatened that he would be killed. He was threatened that his kids would be killed if he continued speaking out against the government. Did he seek medical attention? He did not seek medical attention. What was his explanation? Was he afraid or why? I believe he was afraid, just like he was afraid to report the incidents to higher authorities. And that's the reason he did not go to seek medical attention at the time. But he's not, just because you don't seek medical attention does not mean you haven't been beaten to the point where it does not rise to the level of persecution. I think there's plenty in this record that rises way beyond the level of persecution. The threats, they're not taking into account the threats. Correct. The threats, not only to him, but to his family as well. Well, threats alone aren't necessarily sufficient to amount to torture, are they? Well, I would imagine it would depend on the totality of the circumstances. Especially when there's an adverse credibility determination. That would be true, but if the court finds that there's no adverse credibility determination in this case, then it would have to treat the threats under the totality of the circumstances. And the beatings themselves would definitely rise to the level of persecution. Anything else? Thank you very much, counsel. This now will be submitted. Waddington v. Holder, we've deferred oral argument and retained jurisdiction over the case. United States.
judges: Nelson, Wardlaw, Rawlinson